822 P.2d 960 (1991)
12 Idaho 63
STATE of Idaho, Plaintiff-Respondent
v.
Paul Ezra RHOADES, Defendant-Appellant.
Nos. 17437, 18039.
Supreme Court of Idaho, Idaho Falls, September 1990 Term.
February 13, 1991.
On Rehearing November 14, 1991.
Second Rehearing Denied January 21, 1992.
*963 Radin & Webb, Idaho Falls, for defendant-appellant. Russell E. Webb and John L. Radin argued.
Jim Jones, Atty. Gen. and Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent. Lynn E. Thomas, argued.
McDEVITT, Justice.
This case arises from the murder of Susan Michelbacher. Paul Ezra Rhoades has been convicted in three separate murder cases. For the murders of Susan Michelbacher and Stacy Baldwin, Rhoades was sentenced to death; for the murder of Nolan Haddon he received an indeterminate life sentence based on a conditional plea.
The issues presented in this appeal are:
I. Whether the legislative abolition of the defense of mental condition in criminal cases violates the Idaho or United States Constitutions.
II. Whether the trial court's failure to make a pretrial ruling on the constitutionality of the statutory abolition of the insanity defense was in error.
III. Whether comments made by the prosecuting attorney to the jury during closing argument violated the appellant's right to be free from compelled self-incrimination.
IV. Whether the trial court's limitation on juror inquiry into the effects of the prosecutor's comments constituted harmless error.
V. Whether accelerated post conviction procedures in capital cases are unconstitutional.
VI. Whether inculpatory statements made by Rhoades to the police should have been suppressed.
VII. Whether the prosecution's failure to turn over exculpatory evidence constituted reversible error.
VIII. Whether the jury instructions were proper.
IX. Whether the court erred in compelling a defense expert to prepare a written report or submit to an interview by the prosecutor before testifying.
X. Whether the court erroneously considered a victim impact statement.
XI. Whether the death penalty was properly imposed.
XII. Whether the jury was properly selected.
*964 XIII. Whether the trial court's approval of the method of charging weapon enhancements was erroneous under statutory and case law.

I.-II.

LEGISLATIVE ABOLITION OF THE INSANITY DEFENSE AND PRETRIAL RULING ON AVAILABILITY OF INSANITY DEFENSE
In 1982 the Idaho Legislature abolished the insanity defense in criminal cases by repealing I.C. § 18-209 and enacting I.C. § 18-207(a), which provides that "[m]ental condition shall not be a defense to any charge of criminal conduct."
In this case, prior to trial, defense counsel filed a "Request for Declaration that the Enactment of § 18-207, I.C., the Repeal of §§ 18-208, 18-209, I.C. and the Repeal of Rule 12(g), I.C.R. are Unconstitutional." It was urged that the abolition of the defense deprives criminal defendants of due process rights under the state and federal constitutions. The state filed a motion to quash this request, because, "an insanity defense has not been raised by the defendant and until such time as that issue is raised in good faith by the defendant such a request is an academic exercise as there is no issue in controversy."
Both parties extensively briefed and argued the issue of justiciability; that is, whether there was any factual showing on the record that would grant the court the authority to render a ruling in the nature of a declaratory judgment on the issue. Rhoades had been examined by a psychiatrist pursuant to defense counsel's request. However, the defense did not introduce evidence indicating the psychiatrist's conclusions as to whether there was any basis on which to raise the issue of mental defect.
The defense contended that no showing was required under the unique circumstances of a capital case. The defense asserted that the court did have jurisdiction to render a declaratory judgment, in that the nature of a declaratory judgment is to clarify legal uncertainty, and having no legal definition of insanity made it impossible for a psychiatrist to render an opinion on whether Rhoades was legally insane.
The defense further argued that even if some showing was required, the prosecution and the court had waived the necessity of presenting preliminary evidence on Rhoades's mental condition when a defense request for psychiatric assistance at state expense was granted without the preliminary showing required by statute. The defense argues that this constituted a waiver of any showing that might be required in the later request for a ruling on the existence of the insanity defense.
Finally, the defense urged that there was a sufficient factual showing on the record to bring Rhoades's sanity into issue. Noting that where the insanity defense is permitted it may be established by lay testimony, the defense cited the preliminary hearing testimony of one of the arresting officers to the effect that on the night Rhoades was arrested he was unstable and incoherent.
The trial court held a hearing on the defense request for a "declaration," which consisted of the court inquiring of defense counsel if he was asserting the defense of insanity, if he had an offer of proof that the sanity of the defendant was in question, or an opinion from the psychiatrist that examined the defendant. Defense counsel replied to each inquiry that he could offer no proof until he had a legal standard by which to define insanity.
THE COURT: Do you have an insanity defense that you are raising, or is this an academic exercise we're going through? ... If you have a defense, and you have an expert who is going to testify that this is an issue in this case, then I want to know that.
ATTORNEY: Your Honor, I'm sure the Court is thinking of Ake v. Oklahoma where the U.S. Supreme Court spoke on an indigent's right to have a psychiatrist appointed at public expense. The problem we have here, Your Honor, is there's little authority out of the Supreme Court in this area, that's one of the few cases that come even close to our situation.
THE COURT: My question is, though, do you have, after having Mr. Rhoades examined by a psychiatrist of your choosing, *965 an opinion that the insanity issue is present in this case?
ATTORNEY: Your honor, may I have just a minute, I want to address the precise question the Court is posing to me. In light of Ake, we've been afforded the psychiatrist, ... and if you read the Ake decision, the Court explicitly states that the purpose of providing that psychiatrist at an early point is to allow the defense an opportunity to determine whether a defense is viable ... my point here today ... is that the psychiatrist does me no good unless we know what the law and legal standard is.
THE COURT: You're evading my question. My question, and I want an answer to it, is direct, do you have an opinion from your expert that the sanity of this defendant is in question?
ATTORNEY: Your Honor, I have no opinions from my expert at this time for the simple reason it was to be my next point, that until we know what the legal standard is for a possible sanity defense, defense of mental conditions excluding responsibility of the law, until we know what that is... .
THE COURT: I'm going to go back, the question I'm concerned with is whether or not your expert who examined Mr. Rhoades months ago has rendered an opinion at any time indicating that there is a viable issue as to sanity or the ability of this man to understand what he did and to formulate an intent? I need an answer to that question, and we've danced around it, but we haven't had that directly presented to the Court. Has your expert given you any type of an opinion as to the mental condition of this defendant?
ATTORNEY: Your Honor, again I'm not sure I understand the question... .
The trial court issued a Memorandum Decision refusing to rule on defendant's motion to find I.C. § 18-207 unconstitutional, finding that in the absence of expert testimony or evidence, there was no legitimate issue before the court. Defendant moved to appeal this decision, and another hearing was held. Again, the court asked defense counsel for an offer of proof, and again, none was given.
THE COURT: Let me ask you again as I did in August, do you have,  do you represent to this Court that you have expert testimony available to establish the viability of insanity defense in this case?
ATTORNEY: Well, I'll answer it the way I answered it. First of all, I don't know whether I do or not because a psychiatrist, forensic psychiatrist without a legal standard defining what insanity is could not possibly give me an opinion. That's where that sits.
Defendant's motion to appeal was denied.
We perceive the difficulty of the defense in obtaining an expert opinion on such a complex issue without the guiding framework of a legal standard. We also recognize that a psychiatric opinion on the mental condition of a defendant in a criminal case is forged by a long process of interaction between the expert and the defense, and that the result of that process will not generally be available during the pretrial stage of a criminal case.
However, the trial court did not require that the defense present an expert opinion as to the ultimate issue of Rhoades's sanity. The court requested any expression of opinion by the expert as to whether insanity might be an issue in the case, or an assertion by counsel that he was raising the defense of insanity. The court did not require polished testimony concerning exact mental processes or precise cognitive abilities of the defendant. It would have sufficed for the expert to provide a summary affidavit stating that in his opinion, there was a viable issue of insanity involved in the case. Alternatively, the expert might have submitted an affidavit to the effect that it would be impossible for him to render an opinion without a guiding legal standard. Yet another option might be to offer an opinion based on the definition of insanity that Idaho had in place prior to the legislative repeal of the defense, restricting the affidavit to an in camera review in order to protect the defense from the consequences of prematurely offering an opinion from an improperly prepared defense expert.
The trial court found that the record did not create a justiciable controversy to support *966 a ruling on the issue of the repeal of the insanity defense. We agree.
The authority to render a declaratory judgment is bestowed by statute. The Declaratory Judgment Act, contained in Idaho Code Title 10, chapter 12, confers jurisdiction upon the courts with the option to "declare rights, status, and other legal relations, whether or not further relief is or could be claimed." I.C. § 10-1201. An important limitation upon this jurisdiction is that, "a declaratory judgment can only be rendered in a case where an actual or justiciable controversy exists." Harris v. Cassia County, 106 Idaho 513, 516, 681 P.2d 988, 991 (1984). This concept precludes courts from deciding cases which are purely hypothetical or advisory in nature.
Declaratory judgments by their very nature ride a fine line between purely hypothetical or academic questions and actually justiciable cases. Many courts have noted that the test of justiciability is not susceptible of any mechanistic formulation, but must be grappled with according to the specific facts of each case. Id.; 22 Am.Jur.2d Declaratory Judgments § 33, at 697. This Court, in Harris, adopted the following language from the United States Supreme Court's definition of justiciability as a guiding standard in the context of declaratory judgment actions:
[A] controversy in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.
Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241-42, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted).
The same principle as pronounced by this Court provides:
The Declaratory Judgment Act ... contemplates some specific adversary question or contention based on an existing state of facts, out of which the alleged "rights, status and other legal relations" arise, upon which the court may predicate a judgment "either affirmative or negative in form and effect."
* * * * * *
The questioned "right" or status" may invoke either remedial or preventative relief; it may relate to a right that has either been breached or is only yet in dispute or a status undisturbed but threatened or endangered; but in either or any event, it must involve actual and existing facts.
State v. State Board of Education, 56 Idaho 210, 217, 52 P.2d 141, 144 (1935).
In the present case, there are no actual and existing facts on the record. The record before the trial court, and before this Court, contains nothing more than the statement of counsel that he desired to inquire into the viability of the defense, and that although Rhoades had been examined by a psychiatrist, no opinion in any form as to Rhoades's mental state could be forthcoming unless the court provided an operative legal definition of insanity. As to the impossibility of offering an opinion without a legal standard to work with, the court had only the unsubstantiated statement of counsel to rely upon, there being no evidence from the expert. This unsworn statement does not provide a factual showing sufficient to create a justiciable issue before the court.
The testimony of Officer Rodriguez concerning Rhoades's manner on the night of his arrest likewise does not suffice to create a justiciable controversy on the issue of insanity. The officer stated during the preliminary *967 hearing that on the night of the arrest:
Paul Rhoades was either acting as if he was high on some kind of narcotic, or he was high on some kind of narcotics... . [H]e really didn't have much stability ... he had to be helped to walk. He swayed back and forth when he sat down, almost in a drunken stupor. Didn't say too much, and when he did, he mumbled, as if, I would take it, he was not in control of his senses, ...
Other testimony confirms Officer Rodriguez's impressions of Rhoades's conduct on the night of the arrest, but there is no evidence in the record as to abnormal conduct at any other time. This testimony establishes that Rhoades was having physical difficulty on the night of his arrest, which was assumed by the officers to be the result of drugs or intoxication. The trial court appropriately concluded that such evidence alone does not rise to the level of a showing of the mental condition of the defendant.
The defense argues that any showing that might be required was waived by the prosecution at the time of the hearing on the defense request for appointment of a psychiatric expert at state expense. The United States Supreme Court, in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), held that the defendant is constitutionally entitled to psychiatric assistance at state expense once a preliminary showing has been made that the mental condition of the defendant is likely to be an issue in the case. At the hearing, the prosecution represented that it had no objection to the appointment of a psychiatric expert, and further stated that:
From the state's point of view from what we understand the evidence to be we would understand why they seek these two particular appointments, so we would urge the Court to go ahead and adopt that without requiring any further showing.
Defense counsel urges that this statement by the prosecution, and the court's acquiescence in the motion for a court appointed expert without requiring any preliminary showing on the defendant's mental condition, amounts to a waiver of the required showing on the issue. We disagree.
Justiciability is a question of the jurisdiction of the court over the matter at issue. Baird v. State, 574 P.2d 713, 716 (Utah 1978); Mountain West Farm Bureau Mut. Ins. v. Hallmark Ins., 561 P.2d 706 (Wyo. 1977). It is axiomatic that a lack of jurisdiction may not be cured by means of stipulation or waiver by the parties. Bowlden v. Bowlden, 118 Idaho 84, 794 P.2d 1140 (1990); White v. Marty, 97 Idaho 85, 540 P.2d 270 (1975), overruled on other grounds (1985). Therefore, this defense argument must be rejected.
We uphold the trial court's determination that the record does not create a justiciable controversy to support a ruling on the issue of the repeal of the insanity defense. Having done so, we do not reach the constitutional issue regarding the legislative repeal of the insanity defense.

III.-IV.

COMMENT BY THE PROSECUTOR AND LIMITATION ON JUROR INQUIRY
In closing argument the prosecuting attorney made the following statements:
PROSECUTING ATTORNEY: When I get paid, when you get paid is that how you describe it that you came into some money? That's the phrase you use when you inherit some money or come into some other windfall. In today's world when money changes hands legitimately there's generally a document that documents that transaction. A receipt, a check, a passbook saving's account that indicates the transfer of those funds. What did we hear from the defendant yesterday?
DEFENSE ATTORNEY: Excuse me, Your Honor 
PROSECUTING ATTORNEY: I'm sorry 
DEFENSE ATTORNEY: I'm going to object.
PROSECUTING ATTORNEY: I'm sorry, what did we hear from the defense counsel in the case-in-chief yesterday?
*968 Defense counsel suggests that this constitutes reversible error because it referred to the defendant's failure to testify on his own behalf. We disagree.
The comment in question must be looked at in the context in which it was made. Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Boyde v. California, involved a similar situation. The appellant asserted that comments made by the prosecutor immediately before the jury began sentencing deliberations unfairly influenced the jury. The Court stated:
"This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." (citations omitted).
Id. 110 S.Ct. at 1200.
In the present case, the prosecuting attorney made several references to the defense counsel's failure to explain the State's evidence. Each of these statements referred to the evidence presented by the defense, not about the defendant's failure to testify. So it was with the comment in question.
The trial court, in an Order Denying Motion for New Trial, found that:
The prosecutor's comment, when viewed by itself, may appear to be improper on the surface, however, when viewed in the entire context and perspective of the trial, and the context of the comment, the Court is firmly of the belief beyond a reasonable doubt that any error was harmless.
This finding was based on several facts. The prosecutor immediately corrected himself after making the statement, during voir dire each juror was told that the defendant did not have to testify and that the burden of proving the defendant's guilt beyond a reasonable doubt was on the State, and the jury was given an instruction that they could not draw any inference of guilt from the defendant's failure to testify, nor could that fact enter into their deliberations in any way. In addition, the trial court offered to reinstruct the jury on the issue of the defendant's failure to testify, but that offer was rejected by defense counsel.
We agree that, taken in context, the statement made by the prosecutor did not pertain to the defendant's failure to testify, but instead was a comment on the sufficiency of the defendant's evidence. It is entirely permissible for the prosecutor to comment on inconsistencies in the evidence presented by the defendant, United States v. Scott, 660 F.2d 1145, cert. denied, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982), and to draw inferences from those inconsistencies. United States v. Ellis, 595 F.2d 154, cert. denied, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (3rd Cir.1979).
The defense further argues that the trial court impermissibly limited the scope of inquiry into whether the jury was influenced by the prosecutor's comment. The trial court permitted post-trial interviews of the jurors and authorized the defense to hire an investigator for that purpose. Of the fourteen jurors who heard the case, five jurors agreed to be interviewed, two refused, and seven were not contacted before the hearing. The defense requested a postponement of the hearing in order to have time to contact them, but this request was denied. The court also denied defense counsel's request to call some of the jurors as witnesses at the post conviction proceedings, or to take their depositions.
The investigator was appointed in early October. The hearing took place on January 11, 1989. The trial court found that this was ample time in which to contact the members of the jury and ask them questions. A decision to grant or deny a motion for continuance is vested in the sound discretion of the trial court. State v. Richardson, 95 Idaho 446, 511 P.2d 263 (1973), cert. denied, 414 U.S. 1163, 94 S.Ct. 928, 39 L.Ed.2d 117 (1974). Here, the defendant has not shown that the trial court abused its discretion by denying additional time to contact the other members of the jury. We hold that the trial court did not abuse its discretion in denying defendant's motion for continuance.

*969 V.

ACCELERATED POST CONVICTION PROCEEDINGS
Idaho Code § 19-2719 requires that in capital cases, post conviction relief must be requested within 42 days after the judgment is filed, and completed within 90 days after that. Appellant urges this Court to reconsider our decision in State v. Beam, 115 Idaho 208, 766 P.2d 678 (1988), which held that I.C. § 19-2719 did not violate the defendant's constitutional rights under equal protection analysis. We decline to do so.
Rhoades also claims that I.C. § 19-2719 violates his due process rights, which Beam did not address. Procedural due process issues are raised whenever a person risks being deprived of life, liberty, or property interests because of a governmental action. The requirement is that there must be some process to ensure that the individual is not arbitrarily deprived of his rights in violation of the state or federal constitutions. This requirement is met when the defendant is provided with notice and an opportunity to be heard. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950); Armstrong v. Manzo, 380 U.S. 545, 550, 85 S.Ct. 1187, 1190, 14 L.Ed.2d 62 (1965). The United States Supreme Court provides us with a balancing test to determine if procedural safeguards are adequate in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The three factors to be weighed are: the private interests at stake; the government's interest; and the risk that the procedures used will lead to erroneous results. U.S.C.A. Const.Amends. 5, 14. This Court has employed this due process test in State v. Ankney, 109 Idaho 1, 704 P.2d 333 (1985).
Here, the defendant's interest is in being afforded an adequate opportunity to present legal and factual issues in his defense. The government's interest in enacting I.C. § 19-2719, as stated by the legislature, is "to accomplish the purpose of eliminating unnecessary delay in carrying out a valid death sentence." This was determined by this Court to be a legitimate goal in State v. Beam, 115 Idaho 208, 212, 766 P.2d 678, 682 (1988). The focus of our present inquiry is to determine whether or not I.C. § 19-2719 provides an adequate process to ensure that death sentences are not carried out so as to arbitrarily deprive a defendant of his life.
The statute requires the defendant to "file any legal or factual challenge to the sentence or conviction that is known or reasonably should be known" within 42 days of the filing of the judgment. These challenges arise out of the judicial proceeding just concluded. At this point, counsel has been closely involved with the case for some time, has been present at trial, and has had notice of all issues that are appropriate to be raised within this 42 day limit. All that counsel is required to do is to organize all challenges and issues that arose during trial and are appropriate for appeal within 42 days. That is not an unduly burdensome task. The statute provides adequate notice to the defendant of exactly what is required of him, and sufficient opportunity for all challenges to be heard. In addition, it serves the purpose of the legislature by preventing the unnecessary delays that occur with so much frequency in capital cases. It is important to note that this limit does not preclude challenges that may arise later, for example, evidence discovered subsequent to completion of the trial. There is no absolute bar on successive petitions for relief. Palmer v. Dermitt, 102 Idaho 591, 635 P.2d 955 (1981).
The legislature has seen fit to appropriately limit the time frame within which to bring challenges which are known or which reasonably should be known. The process encompassed in I.C. § 19-2719 providing for review by the trial court and then by this Court, provides adequate opportunity to present the issues raised and to have them adequately reviewed. Idaho Code § 19-2719 is not unconstitutional under due process analysis.

VI.

SUPPRESSION OF INCULPATORY STATEMENTS
Rhoades was arrested on March 25, 1987. He was being sought as a suspect in an *970 Idaho murder investigation, and when his car was identified in Nevada, a Nevada Highway Patrol Officer, George McIntosh, drove to the scene with two officers from Idaho, Victor Rodriguez and Dennis Shaw. Two Nevada officers, Trooper Neville and Officer Miller, were holding Rhoades at the scene. Another Nevada officer, Shires, arrived at the scene as back up. Shaw testified that as he and Rodriguez approached Rhoades where he was being held against the car by Neville and Miller, Rhoades made a spontaneous statement of "I did it," without being directly addressed or questioned by any officer. Miller claims to have heard that first statement, although it was not included in his initial report of the arrest. Miller did include that fact in a supplemental report filed two months later. Officer McIntosh testified that he did not hear the statement, nor was it overheard by Trooper Neville.
After being read his rights, Rhoades was transported to the Highway Patrol Substation in Wells, Nevada. He did not make any statements en route. Officers Shires, Miller, Neville, McIntosh, Shaw, and Rodriguez were present at the station. Shaw made a statement to the defendant to the effect that if he had been apprehended earlier, the victims of his crimes might still be alive. Rodriguez testified that in response to that statement, Rhoades stated, "I did it." This second statement at the station was not part of Miller's initial report, although he claims to have overheard it. Both Shires and Miller reported the statement in supplemental reports filed several months after the arrest. The statement was also not recorded by Officer Shaw in his report. Rhoades made no further statements.
Rhoades argues on this appeal that the trial court should have excluded those statements for three reasons: (1) the questionable reliability of the evidence, given the fact that several of the officers who claimed to overhear the statements failed to record the fact in their reports until months after the arrest; (2) the failure of the police to tape record the statements; and (3) the statements were the result of the violation of Rhoades's Miranda rights.
On the first point, the defense argues that due process under the state and federal constitutions requires an enhanced degree of reliability during the guilt determination stage of a capital prosecution. We reject this argument.
The United States Supreme Court has imposed many procedural protections for capital cases. See, e.g., Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). However, these cases do not go so far as to alter the types of evidence or establish a minimum degree of reliability of evidence that may be admissible during the fact finding phase of a potential capital case. The prosecution in such cases is not required to prove the crime by any higher standard than the "beyond a reasonable doubt" standard used in other criminal cases. Admission of evidence is not governed by any separate rules applicable only to capital cases. Therefore, there is no reason to conclude that testimony which is questionable must be excluded during the guilt determination phase of a capital case. The credibility of evidence in a first degree murder case, as in all others, is an issue for the trier of fact.
Likewise, we cannot accept the contention that in order to be admissible, statements made in custody must be tape recorded by the police. The defense cites an Alaska case, Stephan v. State, 711 P.2d 1156 (Alaska 1985), holding that custodial confessions must be tape recorded in order to be admissible under the Due Process Clause of the Alaska State Constitution. That case represents no more than the prerogative of each state to extend the protections of its own constitution beyond the parameters of federal constitutional guarantees. We decline to adopt Alaska's standard in Idaho.
We now turn to the issue of whether Rhoades's Miranda rights were violated by the police during his arrest and custody.
There is some conflict in the record as to whether Rhoades was read his Miranda rights while in the custody of Nevada Officers Miller and Neville, or if he was given the Miranda warnings for the first time by Officer Rodriguez after Rodriguez, Shaw, and McIntosh arrived at the scene. Although the record does not support the *971 trial court's finding that the first statement by Rhoades was preceded by a Miranda warning, that factual issue does not affect our conclusion that both statements were properly admitted into evidence.
The first "I did it" statement, while Rhoades was handcuffed in the parking lot was apparently spontaneous. So spontaneous in fact, that according to uncontested police accounts, Rhoades made the statement without being questioned or otherwise addressed by any of the officers present. As a spontaneous statement, it was admissible whether it occurred before or after Rhoades was read his Miranda rights.
"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.... Volunteered statements of any kind are not barred by the Fifth Amendment." Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Although the statement entirely lacked any context to make it meaningful, the trial court correctly concluded that it was for the jury to decide to what Rhoades referred when he said "I did it" at the scene of the arrest.
The second statement at the station house, made in response to Shaw's comment, is also admissible. The trial court found that there was insufficient evidence in the record to support the inference that Rhoades had asserted his right to remain silent at any time during the arrest and booking. Officer McIntosh did testify that after Rodriguez finished reading the Miranda rights, Rhoades nodded as if to indicate that he understood. Then McIntosh testified that Rodriguez said something else, which McIntosh could not hear, whereupon Rhoades shook his head. McIntosh took the gesture to mean that Rhoades was asserting his right to remain silent.
Those facts are the sole basis in the record for the contention that Rhoades did assert his right to remain silent. There is no evidence in the record as to what Rhoades was responding to when he shook his head negatively. On the strength of this evidence alone, the trial court declined to infer that the shake of the head indicated a desire to remain silent. That finding is not clearly erroneous, given the lack of evidence to the contrary.
Miranda teaches that "[o]nce warnings have been given, the subsequent procedures are clear. If the individual indicates in any manner, at any time, prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627.
In this case, based on the record before us, Rhoades did not assert his right to remain silent. If he had, Shaw's comment, properly found by the trial court to be "the functional equivalent of interrogation," would have been improper and the second statement would not have been admissible. The requirement that interrogation must cease comes into play when the accused indicates in any manner that he or she does not desire to converse with the police, or that the presence of an attorney is desired. After rights are read to and acknowledged by the detainee, and until the right to silence or counsel is asserted, the police may initiate questioning.
The record indicates that Rhoades was read his rights before the second statement and acknowledged that he understood them. Although there is evidence that Rhoades was heavily influenced by narcotics at the time of the arrest, Officer Shaw testified that while searching his person, he engaged Rhoades in conversation to test his alertness and found that he had sufficient capacity to understand what was going on around him.
In sum, Rhoades had been instructed upon and understood his rights at the time of arrest, and there is insufficient evidence to indicate that he asserted his right to remain silent. For the foregoing reasons we conclude that the second statement made in response to Shaw's "interrogation" is not subject to suppression under Miranda v. Arizona.

VII.

WITHHOLDING OF EXCULPATORY EVIDENCE BY PROSECUTION
On May 15, 1987, the defense filed a request for discovery, asking for "[a]ll *972 Bingham County and/or Blackfoot City Police reports or investigative materials relative to the Stacy Baldwin homicide which is alleged to have occurred in Bingham County." On July 2, 1987, the prosecution filed a Supplemental Response to Defendant's Discovery Request, listing the items that it had provided pursuant to the discovery request, including, "[a]ll Bingham County and/or Blackfoot City Police reports" relative to the Baldwin case.
Part of the materials submitted to the defense in this exchange was a supplementary police report by Detective Newbold of the Blackfoot Police Department, which detailed the confession of Kevin Buckholz to the killing of Stacy Baldwin. Buckholz had been arrested by Blackfoot Police Officer Love on March 14, 1987, for drunk and disorderly conduct. Love's brief report indicated that Buckholz stated he had "killed the girl at the mini barn." Later, while he was in the holding tank, Buckholz initiated conversation with Officer Larry Christian. Christian filled out the following report of the conversation:
[A] prisoner in the holding tank started talking to me (Kevin Buckholt) [sic] said he "had problems and needed to be put away cause he couldn't function in the regular world," he then proceeded to tell me he shot a girl twice in the back. I said what girl and he said "You know the one from the mini barn." I then asked how many shots did you fire, he said "I don't know I shot several times, I hit her in the back twice." ... I then asked him what kind of gun he used and he said "a `38' then said no a `9' mm I think." ...
Christian reported the incident to Detective Newbold, who summarized the statement in his own report. That report was provided to defense counsel for Rhoades pursuant to the discovery request for Blackfoot City Police reports.
Newbold's report mentions Christian's written report, and outlines that report in detail. However, neither Christian's nor Love's report was provided to the defense. On appeal, Rhoades argues that the prosecution's compliance with the discovery request was inadequate, and in violation of the prosecutor's duty to turn over all exculpatory evidence to the defense.
Although this appeal concerns the conviction for the murder of Susan Michelbacher, Buckholz's confession is significant because the killings of Michelbacher and Baldwin were linked by ballistic evidence establishing that the same murder weapon was used in the commission of both crimes.
The test by which to measure the prosecutor's duty to disclose evidence is the materiality of the information at issue. The determination of "materiality" is guided by whether the information tends to create a reasonable doubt about guilt, State v. Brown, 98 Idaho 209, 560 P.2d 880 (1977), or is otherwise "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." United States v. Agurs, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1975).
We do not believe that the outcome of the trial would have been different had the defense received the two other police reports. Officer Newbold's report provided enough detail to stimulate additional inquiry if the defense had been inclined to do so. The defense had the information that there was a confession to the Baldwin murder, the identity of the confessor, the details of the confession, and the name of the officer who heard the confession. With that information they could have contacted Officer Christian and Kevin Buckholz and determined from them whether the confession was worth pursuing. The defense claims that had they received the two additional reports from the prosecution then they would have made more of an effort to locate Buckholz. We believe that the defense could have made that determination without the other two police reports.

VIII.

JURY INSTRUCTIONS
Appellant claims that the trial court erred in its instructions to the jury in a number of respects. Specifically:

*973 1. The court should have instructed on the difference between general intent crimes and specific intent crimes.
2. The court should have instructed on mens rea and the concurrence of act and intent.
3. The court wrongly refused instructions and inadequately defined legal terms.
Appellant asserts that the refusal to instruct on specific intent when a defendant is charged with both specific intent and general intent crimes constitutes error because it could mislead the jury. Appellant cites several California cases for this proposition; however, it was not held in any of these cases to be reversible or prejudicial error. This Court held, in State v. Lankford, 113 Idaho 688, 694, 747 P.2d 710, 716 (1987):
Where the jury instructions, taken as a whole, correctly state the law and are not inconsistent, but may be reasonably and fairly harmonized, it will be assumed that the jury gave due consideration to the whole charge and was not misled by any isolated portion thereof.
We hold that the court's instructions to the jury were adequate. Idaho Code § 19-2132 provides, "In charging the jury, the court must state to them all matters of law necessary for their information." Here, the trial court found that the specific intent instructions requested by the defendant were adequately covered by the instructions given by the court, taken as a whole. In addition, the trial court found that the jury was carefully instructed on intent, and "to have given the requested instructions dealing with diminished capacity, unsoundness of mind, and other similar language as set forth in defense requested Instructions 64, 67, 68, 69, and 70 would have confused the jury because there was absolutely no evidence whatsoever presented relating to defendant's mental condition that would warrant giving [these instructions]." In State v. Fisk, 92 Idaho 675, 681, 448 P.2d 768, 774 (1968), this Court held that it was not error to refuse to give requested instructions if they were covered by other instructions given.
We conclude that the instructions given adequately informed the jury of the law applicable to the issues in question.

IX.

COMPELLING DEFENSE EXPERT TO PREPARE A WRITTEN REPORT OR TO BE INTERVIEWED BEFORE TESTIFYING
The defendant hired a ballistics and hair expert to examine the State's evidence. The expert did not prepare or provide any written reports to the defense. The prosecutor sought an order from the court requiring the defense to "provide the state with copies of reports of examinations conducted by the defense experts ... whom the defendant intends to call at trial," or in the alternative to allow the prosecutor to "interview the defense experts; if reports are not, or have not yet been prepared...." The defense objected to this procedure. The trial court ruled that the expert must either provide a written report to the prosecutor or allow the prosecutor to interview him pursuant to Rule 16(c)(2) of the Idaho Criminal Rules, which provides:
Upon written request of the prosecuting attorney, the defendant shall permit the state to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce in evidence at the trial, or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to testimony of the witness.
Idaho Criminal Rule 16(c)(2) clearly allows access to reports which the defendant intends to introduce at trial or which were prepared by a witness whom the defendant intends to call at trial. However, in ordering *974 a defense expert to prepare a report for opposing counsel, or to submit to an interview by opposing counsel, the court overstepped the boundaries of the rule. The Washington Supreme Court interpreted an analogous criminal discovery rule, in State v. Hutchinson, 111 Wash.2d 872, 766 P.2d 447 (1989), which involved a similar situation. They held that:
It is undisputed that the defendant may be required to disclose any existing expert's report he intends to use at trial. However, the rule does not say that an expert can be required to make a report at the request of the opposing party. Defense counsel claims that no written reports have been requested, received or written. The clear language of the rule does not authorize the trial court to require the defendant's experts to prepare written reports for the state when they have not been prepared for the defendant.
However, we do not believe that this error resulted in prejudice to the defendant. This case differs from Hutchinson, because here, the defense did anticipate having the expert prepare a report, but told the prosecutor that it would not be available until a week before trial. The prosecutor was concerned that this would not be enough time in which to use the evidence to prepare for trial. In managing the trial procedure, the court set a deadline for the production of the expert report, which was within his authority.

X.

VICTIM IMPACT STATEMENTS
We now turn to the issue of the victim impact statement contained in the presentence report. Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), prohibits the introduction of victim impact statements during the sentencing phase of a capital case as violative of the Eighth Amendment to the United States Constitution. In Booth, there were two types of information presented in the victim impact statement. The first type consists of "a description of the emotional trauma suffered by the family and the personal characteristics of the victims," and the second contains the "family members' opinions and characterizations of the crimes." This information is excluded because, "its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." Id. 107 S.Ct. at 2533, 2535.
In the present case, the victim impact statement, in its entirety, states:
The victim in this instant offense, Susan Michelbacher, was a 31 year old wife and mother. She was employed as a Special Education teacher at Eagle Rock Junior High in Idaho Falls. She resided with her husband, Bert, and their 2 1/2 year old son, Christopher Jon, in Idaho Falls. She had been a teacher for about 11 years, she was a member of the Christian Science Church, she was active in sports and community affairs, and a memorial has been established in her name. Her husband, Bert Michelbacher, has suffered emotional trauma at the loss of his wife and her companionship. He explained that for several months he was unable to perform his duties as project engineer at his place of employment at the level of efficiency he is accustomed to. The crime has also had a profound affect [sic] on his financial situation. He has had to hire a full-time nanny to care for his son, he has required some costly psychiatric counseling which was only partially covered by his health insurance plan, and he related that he had to purchase a replacement vehicle for the Ford van, which he cannot bear to look at much less drive. He explained that he wanted to sell the van, but due to it's relationship to the crimes, no one wants to buy it.
Mr. Michelbacher expressed a dissatisfaction with the criminal justice system and it's [sic] tendency to protect the criminal. He seemed to be harboring a significant amount of anger in addition to his grief and sorrow. He stated that he wanted to see justice done. He indicated that by the time justice is done, if justice is done, no one will remember who Susan Michelbacher was or what Paul Rhoades did to her.
*975 This is undoubtedly a victim impact statement of the kind contemplated in Booth v. Maryland, and as such, it was error for the trial court to admit it.
The next level of inquiry is to determine if the victim impact statement constitutes harmless error under the State v. Paz, 118 Idaho 542, 798 P.2d 1 (1990), exception. This Court, in Paz, relied on Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), in holding that victim impact statements included in the presentence report, while error, could, under appropriate circumstances, be harmless error.
The test to apply to determine if the use of such statements was harmless is whether this Court is assured that "it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).
The only evidence in the record that the district court may have considered the information in the matter of a victim impact statement is one sentence in the Findings of The Court in Considering the Death Penalty: "[a]s a result, a husband is left without a wife, a child without a mother, and a community without the valuable contribution of a conscientious school teacher." This is a statement of facts recited by the trial court as a result of having heard the evidence at trial. There is no indication that any evidence of the kind proscribed by Booth diverted the trial court from its primary function of considering the defendant being sentenced and not the victim or the victim's family.
In reviewing the record in this case, we are convinced beyond a reasonable doubt that the victim impact statement in the presentence investigation report did not influence the trial court in its imposition of sentence. The error was therefore harmless, and the case need not be remanded for sentencing.

XI.

WHETHER THE DEATH PENALTY WAS PROPERLY IMPOSED
Appellant asserts that the trial court failed to adequately consider alternatives to the death penalty. In State v. Leavitt, 116 Idaho 285, 775 P.2d 599 (1989), this Court reversed the imposition of the death penalty and remanded, because:
[T]he trial court failed to give adequate consideration of the alternatives which exist between the distant poles of `rehabilitation and possible probation,' or the death penalty. Clearly, alternatives were and are available to a sentencing court, such as a fixed life sentence.
Id. at 294, 775 P.2d 599.
The Court in Leavitt did not specify what constitutes "adequate consideration of the alternatives," or exactly what the trial court would have to say in order to show that the alternatives were adequately considered. Here, in Findings of the Court in Considering the Death Penalty, the trial court titled a subsection "Sentencing Alternatives" and stated, "Conviction of these two crimes raises the possibility of the death penalty and other lesser sentences." The court then goes on to say:
[A]ny rehabilitation that is possible is markedly outweighed by the need to protect society, deter such crimes, and to punish and obtain retribution for the wrong committed... . the imposition of the death penalty in this case would not be unjust, and that the imposition of any other penalty would seriously depreciate the seriousness of the crime committed.
We hold that this is sufficient to indicate that the trial court did consider alternatives to the death penalty and decided against imposing them after contemplating the unique circumstances of this case.
The defendant also asserts that mitigating factors were not adequately considered. The pertinent section of I.C. § 19-2515 provides:
(c) Where a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless the court finds at least one (1) statutory aggravating circumstance. Where the court finds a statutory aggravating circumstance the court shall sentence the defendant to death unless the court finds that mitigating *976 circumstances which may be presented outweigh the gravity of any aggravating circumstance found and make imposition of death unjust.
The clear language of the statute mandates that if an aggravating circumstance is present, "the court shall sentence the defendant to death unless the court finds that mitigating circumstances ... outweigh the gravity of any aggravating circumstances... ."
Here, the trial court outlined the mitigating factors in detail, taking into consideration the defendant's education, social and economic status, vocational skills, drug and alcohol use, criminal record, personal redeeming characteristics, and the fact that he has been a cooperative prisoner since the time of his arrest. The court then went on to find three aggravating factors as listed in I.C. § 19-2515(g): (1) that the murder was "especially heinous, atrocious or cruel, manifesting exceptional depravity," (2) that it was murder of the first degree committed with the specific intent to cause the death of a human being, and (3) that the defendant "has exhibited a propensity to commit murder which will probably constitute a continuing threat to society." After weighing the mitigating factors against the aggravating circumstances, the trial court imposed the death penalty. All of this was well within the guidelines of the statute.
As for the defendant's claim that the trial court engaged in impermissible speculation and overemphasized aggravating factors, we find no merit in this argument. To be sure, the trial court did employ language that could be construed as passionate or emotional, but we will not presume to dictate the writing style which judges must use in their findings.
The trial court carefully followed the provisions of I.C. § 19-2515 in imposing the death penalty. We find no abuse of discretion.
The final issue presented by the defendant concerning the imposition of the death penalty is that he was improperly sentenced by a judge without jury input. This Court has held "that there is no federal constitutional requirement of jury participation in the sentencing process and that the decision to have jury participation in the sentencing process, as contrasted with judicial discretion sentencing, is within the policy determination of the individual states." State v. Creech, 105 Idaho 362, 373, 670 P.2d 463, 474 (1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984). The United States Supreme Court held in Clemons v. Mississippi, 494 U.S. 738, ___, 110 S.Ct. 1441, 1446, 108 L.Ed.2d 725 (1990), that "[a]ny argument that the constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court." In addition, in Walton v. Arizona, ___ U.S. ___, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the United States Supreme Court held that Arizona's statute which, like Idaho's, provides for sentencing by a judge in capital cases is not unconstitutional.

XII.

WHETHER THE JURY WAS PROPERLY SELECTED
Defendant objected to the practice of transporting the jurors from Boise to Idaho Falls for the trial. He asserted that there were at least four jurors who were excused solely because it was inconvenient for them to have to travel to Idaho Falls, and that they would have been able to serve if the trial had been held in Boise. Defense counsel voiced this objection and listed the jurors who fell into this category. One juror had three small children and her husband was away from home, another was a sole proprietor and could not leave his business, the third had a husband who had just undergone surgery, and the fourth was planning a move out of state. The trial court addressed this argument as to each juror and concluded that, "all four of those would have been excused regardless of where we hold the jury trial." We accept the trial court's decision and do not find there to be an abuse of discretion.
Appellant also assigns error to the exclusion of two potential jurors. One *977 of them, Michael Krubsack, was passed for cause by both sides. The next day he requested an opportunity to speak to the court again, and said that he and his family were planning a move out of state and that having to go to Idaho Falls for the trial would pose an extreme hardship. The finding of the court was that Krubsack "had a state of mind and a personal situation which would have prevented his attention from being substantially devoted to this proceeding as contemplated in I.C. § 19-2019." He was excused. The other, Michael Landry, was excused for various reasons. The court found that he would be a disruptive juror and would not act with impartiality. His father was in prison for murdering several members of his family, and this left Landry with some strong opinions in favor of the death penalty. Landry advocated public stoning, charging 50 cents per rock, and according to the court, "exhibited behavior, attitudes and, state of mind which was not conducive to serving as a juror considering the serious nature of the charges." We find no abuse of discretion in these findings of the court.

XIII.

FORM OF WEAPONS ENHANCEMENT CHARGES
Rhoades contends that the prosecution's decision to charge weapons enhancements as separate counts in the indictment was prejudicial, in that it would lead a jury to believe that Rhoades was charged with additional crimes. He argues that I.C. § 19-2520, which allows enhanced sentences for the use of a firearm or deadly weapon in the commission of certain felonies, does not create a separate substantive crime, and should not be permitted to be present in the information in a format which could lend the impression that it constitutes a separate crime.
The statute specifically provides that a person convicted of certain enumerated felonies "who displayed, used, threatened, or attempted to use a firearm or other deadly weapon while committing the crime, shall be sentenced to an extended term of imprisonment." I.C. § 19-2520. In order to impose this additional term, the defendant must be "separately charged in the information or indictment and admitted by the accused or found to be true by the trier of fact... ." The trial court followed the explicit language of the statute. This was not error.

XIV.

CONCLUSION
After independently reviewing the record and transcript describing the character of the defendant, the nature of the crime of which he has been convicted, the circumstances of the crime of which he has been convicted, we hold that there existed an adequate basis for imposing the death penalty.
The judgment entered and sentence imposed are affirmed.
BAKES, C.J., and McDERMOTT, J. Pro Tem., concur.
BISTLINE, J., concurs in the result.
JOHNSON, Justice, concurring specially and dissenting:
In concur in part VIII (JURY INSTRUCTIONS) of the Court's opinion so far as it goes. I write only to point out that Rhoades challenged the propriety of the reasonable doubt instruction given by the trial court. The portion of this instruction that Rhoades asserted was the most objectionable stated:
A reasonable doubt is an actual doubt based upon the evidence or lack of evidence. It is such doubt as you are conscious of after going over in your minds the entire case and giving consideration to all the testimony. If you then feel uncertain and not fully convinced that the defendant is guilty or if you feel that you would not be acting reasonably should you find him guilty, and if you believe that a reasonable man in any matter of like importance in his own affairs would hesitate to act because of such doubt as you are conscious of having, then that is a reasonable doubt, and *978 the defendant is entitled to the benefit of it.
Rhoades has cited Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), among the authorities upon which he relies in challenging this instruction. In Cage the Court found that the phrases "grave uncertainty," "actual substantial doubt," and "moral certainty" combined together in a reasonable doubt instruction caused the instruction to violate the Due Process Clause.
The instruction in this case does not have these same defects. Although "actual doubt" and "conscious" are used in the instruction in this case, they do not, in my view, cause the same problem that the Court saw with the instruction in Cage.
I dissent from part X (VICTIM IMPACT STATEMENTS) of the Court's opinion. In applying the harmless error rule in death penalty cases where victim impact statement information was included in the record before the trial court, I would require a statement by the trial court that the information had not been considered.

ON REHEARING
McDEVITT, Justice.
This case arises from the murder of Susan Michelbacher. Paul Ezra Rhoades has been convicted in three separate murder cases. For the murders of Susan Michelbacher and Stacy Baldwin, Rhoades was sentenced to death; for the murder of Nolan Haddon, he received an indeterminate life sentence based on a conditional plea.

ARGUMENT ON REHEARING
Appellant filed a petition for rehearing on March 4, 1991. In it, he requested rehearing on nine issues. On April 8, 1991, we granted rehearing only as to the constitutionality of the reasonable doubt jury instruction.

INSTRUCTION NUMBER 23:

THE REASONABLE DOUBT INSTRUCTION
This jury instruction was read to the jury as follows:
A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in a case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. Thus a defendant, although accused, begins the trial with a clean slate with no evidence against him. And the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. The effect of this presumption is to place upon the State the burden of proving him guilty beyond a reasonable doubt.
Reasonable doubt is defined as follows:
It is not mere possible doubt, because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is the state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.
A reasonable doubt is an actual doubt based upon the evidence or lack of evidence. It is such doubt as you are conscious of after going over in your minds the entire case and giving consideration to all the testimony. If you then feel uncertain and not fully convinced that the defendant is guilty or if you feel that you would not be acting reasonably should you find him guilty, and if you believe that a reasonable man in any matter of like importance in his own affairs would hesitate to act because of such doubt as you are conscious of having, then that is a reasonable doubt, and the defendant is entitled to the benefit of it.
But if, after considering all of the evidence, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt, and you should render your verdict accordingly.

*979 THE REASONABLE DOUBT JURY INSTRUCTION COMPLIES WITH DUE PROCESS
Appellant attacks the third paragraph of the reasonable doubt instruction. The thrust of appellant's argument is that the instruction, read as a whole, could be interpreted by a juror to suggest that a higher degree of doubt than a reasonable doubt is necessary in order to acquit. Specifically, he argues that the term "actual" suggests that some doubts do not count. He also argues that the term "conscious" suggests something more than "reasonable." He argues that the word "feel" requires the jurors to turn to their inner feelings rather than to the evidence. Additionally, he argues that the phrase "fully convinced" suggests that it is not enough to be partially convinced of innocence. He argues that the reference to a "reasonable man" is inappropriate for a jury instruction in a criminal case. Finally, he argues that the phrase "hesitate to act" accentuates the word "feel." Appellant concludes that paragraph three cannot be reconciled with the clear definition of "reasonable doubt" contained in paragraph two.
The analysis of the issue on rehearing must begin with the fundamental principle of criminal law:
Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.
In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).
When the term "reasonable doubt" appears in a jury instruction, and when the jurors must understand it and apply it, "the term should be defined more precisely so that there is no question in the jurors' minds with respect to the concept." State v. Holm, 93 Idaho 904, 908, 478 P.2d 284, 288 (1970). So, when a jury is instructed on the reasonable doubt standard, the instruction cannot raise the degree of doubt necessary for an acquittal.
Appellant points to the fact that the jury instruction given in the district court below was not identical to the California jury instruction that we announced our preference for in Holm, 93 Idaho at 907-08, 478 P.2d at 288, and again in State v. Cotton, 100 Idaho 573, 577, 602 P.2d 71, 75 (1979). Today, we again reaffirm the holding of Cotton that the only appropriate instruction on reasonable doubt is the California jury instruction.
In this case, appellant requested the district court to give a reasonable doubt jury instruction that was identical to the preferred California jury instruction. The court gave an instruction that included the language of the California instruction with an additional two paragraphs. While it was inappropriate for the district court to not give the California jury instruction, our review is limited to whether the instruction that was given to the jury misstated the law or was so confusing and argumentative as to mislead the jury. Cotton, 100 Idaho at 576, 602 P.2d at 74.
Appellant cites the recent United States Supreme Court decision of Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), a per curiam opinion, for the proposition that it is never permissible for any combination of words to suggest a higher standard for acquittal than reasonable doubt. The Cage Court was faced with the issue of "whether the reasonable doubt instruction in this case complied with Winship." Cage, ___ U.S. at ___, 111 S.Ct. at 329 (emphasis added). The Court concluded that "the instruction at issue was contrary to the `beyond a reasonable doubt' requirement articulated in Winship." Cage, ___ U.S. at ___, 111 S.Ct. at 329. We conclude that the Cage instruction is not similar to the instruction at issue in this case. Accord, Lord v. State, 107 Nev. 28, 806 P.2d 548, 554 (1991).
The instruction given to the jury in this case contained the California jury instruction. However, it expanded on that definition. The first two paragraphs of the instruction constitute the preferred California *980 instruction. The third and fourth paragraphs do not impose a higher standard than "reasonable doubt." We therefore hold that while it was inappropriate for the district court to not give the appellant's requested instruction, the instruction that was given did not misstate the law and was not so confusing and argumentative as to mislead the jury. Any embellishment or addition to the California reasonable doubt instruction risks misstating the law.
The judgment entered and sentence imposed are affirmed. Upon issuance of the remittitur, the district court shall set a new execution date. I.C. § 19-2719(11).
BAKES, C.J., JOHNSON, J., and McDERMOTT, J., Pro Tem., concur.
BISTLINE, Justice, dissenting.
As the majority notes, "[t]oday we again reaffirm the holding in [State v.] Cotton, [100 Idaho 573, 577, 602 P.2d 71, 75 (1979)] that the only appropriate instruction on reasonable doubt is the California jury instruction." It should be remembered, however, that the adoption of the California reasonable doubt instruction in Cotton was not at all unanimous.
Chief Justice Bakes, at that time an Associate Justice of the Court, specially concurred in Cotton, writing what this one member of the Court viewed as being more of a dissent than it was a concurrence:
I question, however, ... the Court's carte blanche approval of the California jury instruction.... That instruction has its own problems. As an example, the instruction states that everything relating to human affairs, and depending on `moral evidence,' is open to some possible or imaginary doubt. I have always thought that the use of word `moral' in that part of the instruction was a typographical error which had been blindly perpetuated throughout the years. I was surprised to find the phrase `moral evidence' defined in Black's Law Dictionary (5th ed.), p. 909, as:
`As opposed to "mathematical" or "demonstrative" evidence, this term denotes that kind of evidence which, without developing an absolute and necessary certainty, generates a high degree of probability or persuasive force. It is founded on analogy or induction, experience of the ordinary course of nature, and the testimony of men.'
We do not instruct the jury on the definition of `moral evidence' and it is well we don't; otherwise the jury might conclude that a reasonable doubt can be raised by `moral evidence' and not by other kinds, i.e., `mathematical' or `demonstrative' evidence. If we are going to adopt the California jury instruction in Idaho, we ought to excise the word `moral' in front of the word `evidence.'
The instruction then goes on to advise the jury that there is a reasonable doubt if the evidence `leaves the mind of the jurors in that condition that they cannot say they feel an abiding conviction, to a "moral certainty, of the truth of the charge."' There is certainly a question whether the jury is any better informed by equating a lack of reasonable doubt with `an abiding conviction, to a moral certainty, of the truth of the charge,' as the California jury instruction provides, rather than by defining reasonable doubt as `the same kind of doubt interposed in the graver transactions of life [which] would cause a reasonable and prudent man to hesitate and pause,' as the trial court instructed in this case.
It is problematic whether a jury would be helped any more by giving one than the other, and it may well be that the words themselves, `reasonable doubt,' have a clearer meaning than the definition set out in either instruction. This no doubt accounts for those cases [cited by the majority], which state that either it is error for a trial judge to attempt to define reasonable doubt, or that it is not error to fail to define the term. As the Wyoming Supreme Court recently observed:
`[T]he term "reasonable doubt" need not be defined and a trial court would be well-advised to avoid instructions on reasonable doubt. Therefore an instruction *981 purporting to define reasonable doubt should not be given.
`We again reviewed the matter of giving a reasonable doubt instruction in Bentley v. State, Wyo., 502 P.2d 203, 206. In that case we said the phrase "reasonable doubt" is self explanatory and definitions do not clarify its meaning but rather tend to confuse the jury.' Cosco v. State, 521 P.2d 1345, 1346 (Wyo. 1974).
Cotton, 100 Idaho at 579-80, 602 P.2d at 77-78.
Another member of that Court, (Bistline, J., specially concurring) observed:
On the one hand we have the Court holding that it was error for the trial court to refuse defendant's instruction on reasonable doubt, the Court having in the year 1970 given that instruction the stamp of approval. On the other hand we have one member of the Court casting doubt on that instruction. There is much to what Justice Bakes writes. `Beyond a reasonable doubt' may be sufficient without further explanation and attempts at further refinements to the definition may cause confusion where perhaps none existed.
... .
It does seem that, the question having been raised by Justice Bakes, some further discussion by the Court might have been in order. Frankly, as with Justice Bakes, I do not see much in the California jury instruction to commend it. Sitting as the new member of a court which has allowed itself to become deeply involved in the making of rules, some of which I fear transcend into the substantive law, it seems that we could take time to delve more deeply into the validity of the instruction now brought in question.
Criticism of the California instruction means little, however, unless it is constructive. Accordingly, I offer up for semantic dissection the following suggested instruction on reasonable doubt:
`The law gives a defendant in a criminal action a presumption of innocence which presumption remains with the defendant throughout the trial. The law places upon the State the burden of proving the defendant guilty. This is not the burden of proving that the defendant is more likely guilty than innocent, but requires that the evidence presented prove the defendant's guilt beyond a reasonable doubt. Doubt is a word of common usage and needs no further definition. A reasonable doubt is simply a doubt which you would entertain because it is reasonable. If, however, to you the doubt is not reasonable, then you will not entertain it, but cast it out.'
`Beyond is equally a word of common usage. Hence you are simply instructed that the evidence presented must convince you at least beyond a reasonable doubt that the defendant is guilty. In reaching a verdict you should be mindful that "beyond a reasonable doubt" is the same quality of proof which you would want required were you a defendant charged with a crime.'
Cotton, 100 Idaho at 580, 602 P.2d at 78 (Bistline, J., concurring specially).
The words of Justice Bakes were well chosen then and are still applicable. The California instruction is confusing and, in all likelihood, unnecessary. Here, however, the majority starts from the erroneous assumption that the two paragraph California instruction so clearly informs the jury as to the law that the additional of two more perplexing paragraphs "was not so confusing and argumentative as to mislead the jury." That is like saying four swift kicks to the head cause no more confusion than just two.
In fact, the instruction here furnished to the Rhoades jury is nothing more than a compilation of vague terms one piled upon another. Reasonable doubt, in one part of the instruction, is not "mere possible doubt" or an "imaginary doubt." Rather it is "an abiding belief, to a moral certainty," "an actual doubt," "an actual doubt based upon the evidence or lack of evidence," "such doubt as you are conscious of after going over in your minds the entire case," and it is the "uncertain" and "not fully convinced" feeling, and the belief that *982 would cause a reasonable man (but not woman) to hesitate to act. One worry is that ordinarily reasonable persons performing jury duty on seeing such an abundance of "doubt" may well turn into twelve doubting Thomases. Conversely, the ill-conceived attempt to define what constitutes reasonable doubt could cause the jury to actually lower the state's burden of proof. It is impossible to conclude that the above compilation of ambiguous terms served any purpose other than to confuse the jury.
Moreover, the "moral certainty" language of the instruction has been criticized on high for denigrating the requirement of "evidentiary certainty," mandated by the due process clause of the fourteenth amendment. The United States Supreme Court wrote in Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 330, 112 L.Ed.2d 339 (1990):
When those statements [requiring `substantial doubt' and `grave uncertainty'] are then considered with the reference to `moral certainty' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that was required by the Due Process Clause.
In light of these considerations of the instruction as given, there is now one justice's certain vote that the better and proper course would be to reverse and remand for a new trial, where, hopefully, an improved instruction, if one is to be given, would be of some aid to the jury.