# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL EZRA RHOADES,
  *Petitioner-Appellant,*

v.

JEFF HENRY, of the IMSI,
Department of Corrections State of
Idaho,*
  *Respondent-Appellee.*

No. 07-99023

D.C. No.
CV-93-00156-S-EJL
District of Idaho,
Boise

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Submission Deferred March 8, 2010
Resubmitted July 15, 2010
Seattle, Washington

Filed July 15, 2010

Before: Pamela Ann Rymer, Ronald M. Gould and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Rymer

*Jeff Henry is substituted for his predecessor, Arvon J. Arave, Department of Corrections State of Idaho. Fed. R. App. P. 43(c)(2).

## COUNSEL

Oliver W. Loewy, Federal Defender Services of Idaho, Moscow, Idaho; Dennis A. Benjamin, Nevin, Benjamin, McKay & Bartlett, Boise, Idaho, for the petitioner-appellant.

L. LaMont Anderson, Deputy Attorney General, Boise, Idaho, for the respondent-appellee.

## OPINION

RYMER, Circuit Judge:

Paul Ezra Rhoades was convicted by an Idaho jury of the 1987 first degree murder, first degree kidnapping, robbery, rape, and infamous crime against nature of Susan Michelbacher. The trial court sentenced him to death on his convictions for first degree murder and first degree kidnapping; and the Idaho Supreme Court upheld his conviction, sentence, and denial of post-conviction relief. *State v. Rhoades* (Michelbacher), 822 P.2d 960 (Idaho 1991). The district court denied his petition for habeas corpus. Rhoades appealed, and we previously affirmed denial of relief on the conviction, *Rhoades v. Henry* (Michelbacher), 598 F.3d 495 (9th Cir. 2010). However, because a post-conviction petition asking the Idaho Supreme Court to apply *Ring v. Arizona*, 536 U.S. 584 (2002), retroactively was then pending before the Idaho Supreme Court, we deferred submission on penalty phase issues. That court has now ruled, upholding the sentence. *Rhoades v. State*, ___ P.3d ___, 2010 WL 937272 (Idaho Mar. 17, 2010), *reh'g denied* (June 4, 2010). Accordingly, we now turn to the issues on which Rhoades seeks to overturn the district court's judgment that his sentence was not constitutionally infirm. We see no error, and affirm.

I

The facts are set out in the Michelbacher opinion, but in brief, Michelbacher was a teacher who left for school around

6:30 in the morning of March 19, 1987, to make lesson plans for a substitute and to return home because she wasn't feeling well. She made it to school, but not home. Around 7:30 a.m. a van that looked like Michelbacher's, with Rhoades as a passenger, nearly collided with Valerie Stapf in a parking lot. It backed off and went toward the First Interstate Bank where Michelbacher cashed a check for $1000 at the drive-in window when it opened at 8:30 a.m. A few minutes later she cashed another $1000 check at another branch. Around 10:00 a.m. Susan Browning, who lived less than a mile from where Michelbacher's body was found, saw Michelbacher's van enter her driveway then back out. She identified Rhoades as the driver. Others saw Rhoades in the van later in the day.

Michelbacher's body was found on March 21 in a remote, rural area. She had been raped, shot nine times — once while standing and the rest while lying down — and her attacker had ejaculated into her mouth when she was either almost dead or already dead. Rhoades could not be excluded as the semen donor, or as the source of head and pubic hair retrieved from her body. Rhoades was seen with a large amount of cash after Michelbacher's death, and he went to Nevada to gamble.

A Ford LTD stolen from Rhoades's mother was spotted on the median of a highway not far from Wells, Nevada. A .38 caliber revolver was found lying on the ground outside the driver's door; it was the gun used to fire the bullets that killed Michelbacher. Rhoades was tracked to the 4 Way Casino and arrested. When one of the Idaho police officers at the scene remarked that if he had arrested Rhoades earlier, maybe the victim would be alive, Rhoades responded "I did it."

After the jury found Rhoades guilty on all counts, the trial court held a sentencing hearing. It concluded that the mitigating factors did not outweigh any of the statutory aggravating circumstances that it found. Accordingly, the judge sentenced Rhoades to death for first degree murder and for first degree

kidnapping. It imposed fixed life prison sentences for the remaining crimes.

The Idaho Supreme Court upheld his sentence and denial of post-conviction relief. *State v. Rhoades* (Michelbacher), 822 P.2d 960 (Idaho 1991). Rhoades filed for habeas relief in federal court before the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), so this petition is governed by pre-AEDPA law.

While his federal petition was pending, Rhoades filed several successive petitions in state court. One claimed that he was entitled to jury sentencing based on *Ring v. Arizona*, 536 U.S. 584 (2002). Following dismissal by the Idaho Supreme Court based on *Schriro v. Summerlin*, 542 U.S. 348 (2004), Rhoades petitioned for a writ of certiorari to the United States Supreme Court. The petition was granted and the case remanded for further consideration in light of *Danforth v. Minnesota*, 552 U.S. 264 (2008), which indicated that states may decide to apply *Ring* retroactively to state post-conviction proceedings. We deferred ruling on penalty phase issues until this issue was resolved. On March 17, 2010, the Idaho Supreme Court "adopt[ed] *Teague* [*v. Lane*, 489 U.S. 288 (1989)], conclude[d] that *Ring* is not retroactive under Idaho law and affirm[ed] the district courts' denial of [Rhoades's] requests for relief." *Rhoades v. State*, 2010 WL 937272 at *11. Accordingly, we now address Rhoades's claims with respect to his sentence.

II

Rhoades claims that his trial counsel rendered ineffective assistance in failing to investigate, develop, and present mental state issues, in particular, with respect to obtaining assistance of mental health experts, seeking meaningful mitigation investigation assistance, and otherwise familiarizing themselves with Rhoades's background. For example, he argues, counsel furnished no social history to the expert they did

have, they were either unaware of incest within Rhoades's family or did not think it was important, and they didn't have specific information about Rhoades's drug use and didn't believe it was germane. In addition, he submits that the district court abused its discretion in denying him an evidentiary hearing on the issue.

### A

The trial court appointed Stephen Hart and John Radin to represent Rhoades. Radin's partner, Russell Webb, also worked on the case. Webb and Radin were primarily responsible for handling mental health issues.

Webb's 2007 declaration indicates that he hired Dr. Kenneth Ash before trial to look into a potential insanity defense. Counsel had very little social history information about Rhoades to give Ash, but did furnish police reports, information from Rhoades's school transcript, and their investigator's initial report. Dr. Ash examined Rhoades, and concluded there was no basis for an insanity defense.

Radin was deposed in 1996 in the federal proceeding. He indicated that counsel contacted Ash in part because they were aware of Rhoades's drug use, and Ash had some speciality in this field. He said the family was aware of Rhoades's drug use, but not the extent of it. Counsel did not focus on drug use at trial or sentencing as they did not think it would help their actual innocence defense. In Radin's view, the focus didn't shift between the guilt phase and sentencing because they continued to maintain innocence. They made a tactical decision that Ash could hurt more than help given counsel's wish to preserve legal issues about the state's repeal of an insanity defense. However, they hired an investigator to prepare a presentence report. Radin learned about allegations of incest between Rhoades and his sister through their investigator's presentence report; Rhoades never mentioned it him-

self. He didn't dwell on it at sentencing because Rhoades's family was in the courtroom.

Hart also was deposed in 1996. As he was in charge of learning about Rhoades's background, he spent a lot of time talking to family members and had some contact with neighbors. Hart stated that given twenty-twenty hindsight, he might approach the problem of psychological testing, drug use, and abnormal rearing differently today than at the time.[1] On the one hand, he said this wasn't a conscious decision because they didn't perceive those things as being mitigating; on the other hand, he stated they had made a conscious decision not to get into mental issues because they were following the same case approach (actual innocence) throughout.

Counsel had a presentence report prepared that included a statement from Rhoades professing his innocence; a list of his prior arrests and how they were resolved, along with Rhoades's explanation for some of them; a brief description of family history, education, employment, and relationships; and an evaluation. It highlighted Rhoades's positive character traits, in particular his non-aggressive nature and trustworthiness with females. It addressed his childhood polio and how he had been discriminated against due to his family's reputation. The report mentioned Rhoades's use of alcohol and drugs.

The state also submitted a presentence report describing Rhoades's criminal record, family information, interests and activities, education, and employment. It covered his childhood polio and indicated that he sometimes had to fight

---

[1]We note that "it is all too easy" for counsel or a court "to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002). That is why the Court has repeatedly cautioned that courts must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*; *see Strickland v. Washington*, 466 U.S. 668, 689 (1984).

because his name was Rhoades, he was not aggressive toward people or animals, he often babysat his nieces and nephews, and he was a skilled sheetrocker. The state's report also noted that Rhoades had applied to the Army and Marine Corps but had been turned down due to polio. In addition, it included a section on Rhoades's health, reciting that he denied having any mental or emotional problems, has a balance problem as a result of polio, and had used and abused drugs of all kinds for 19 years. The presentence officer expressed his opinion that a psychological evaluation was warranted. Finally, the state's report indicated that collateral contacts and family members described Rhoades's youth and early adulthood as "comparatively normal."

Before the sentencing hearing, the trial judge followed up on the state presentence officer's recommendation by asking whether Rhoades objected to psychological testing. Webb strongly opposed it, noting counsels' concern that there was another trial coming up, and that whatever was done in this sentencing would potentially affect that matter. When the judge nevertheless arranged for a local expert to evaluate Rhoades, Webb again expressed strong opposition. This time he mentioned the possible interaction with Idaho's repeal of the insanity defense, and the Fifth Amendment implications given the unusual time frame of another murder trial in the offing. The court backed off.

At the sentencing hearing, the state called no witnesses and Rhoades called twenty (his mother, father, two sisters, brother, sister-in-law, two aunts, three uncles, one cousin, and eight jail officials). Several noted the difficulty of Rhoades's childhood polio and foot surgeries, and how he was left poorly coordinated. Many claimed he could not be guilty of the crimes charged. Rhoades's mother said she knew Rhoades had used drugs and maybe had sold them; his brother testified that he knew Rhoades was on drugs. A few witnesses discussed how Rhoades was a good worker, and the jailors testified that he was a well-behaved and helpful inmate.

Radin's closing argument outlined why the state had failed to prove the aggravating factors beyond a reasonable doubt, and talked about Rhoades's gentle nature and trustworthiness with women; his lack of prior felonies and minor record; lingering doubts as to guilt; difficulties resulting from polio and surgeries; his family's poverty; his lack of education; his capacity for rehabilitation and potential to be a model prisoner; his redeeming qualities; and evidence that Rhoades fell into a pattern of drug and alcohol abuse.

Under Idaho law at the time of Rhoades's sentencing, when a person is convicted of first degree murder the judge determines whether at least one of ten statutory aggravating circumstances has been established beyond a reasonable doubt. *See* Idaho Code § 18-4004 (1988); *id.* § 19-2515. If at least one circumstance is found, the court "shall sentence the defendant to death unless the court finds that mitigating circumstances which may be presented outweigh the gravity of any aggravating circumstance found and make imposition of death unjust." *Id.* § 19-2515(c). The same mitigation inquiry is made in the case of first degree kidnapping if the judge finds, beyond a reasonable doubt, at least one of five statutory aggravating circumstances. *See id.* §§ 18-4504, 4505.

The sentencing judge made extensive findings. Among other things, he found that Rhoades had a limited education but was relatively intelligent; his family life was normal, though he was subject to abuse or rejection in other settings because he was a member of the Rhoades family and had residual effects from polio, which he substantially overcame; he was a skilled sheetrocker with a good employment history; he used alcohol and drugs to excess; he had been a cooperative prisoner; he had no prior significant record; and he was a trusted babysitter and was trusted by women who knew him. On the aggravating side, the judge found that Rhoades's crimes were extremely wicked, shockingly evil, and designed to inflict a high degree of physical and mental pain with utter

indifference to Michelbacher's suffering. As the judge explained:

> Defendant repeatedly and brutally shot Mrs. Michelbacher as she struggled to escape. The shooting required defendant to *reload* his six shot .38 caliber revolver at least once. Defendant then senselessly and needlessly stood over his victim and shot her as he walked beside her while she laid on the ground. Then, after having shot his victim eight times, turned her over and shot her in the middle of her chest at close range. Thereafter, as she lay dying, he somehow mounted, straddled or laid himself on the face, shoulders and chest of his victim, inserting his penis into her mouth, and ejaculated.

After that, the judge observed, Rhoades appeared normal, paid bills, entertained himself, and gambled with the spoils of his crime.

The court found three aggravating factors on the murder conviction beyond a reasonable doubt: (1) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity, in that Rhoades repeatedly shot Michelbacher as she struggled to escape, requiring him to reload his revolver, then senselessly stood over his victim and shot her as she lay on the ground, then after having shot Michelbacher eight times, turned her over and shot her in the middle of her chest at close range, and thereafter, inserted his penis into her mouth and ejaculated. He left her to die. While she was alive Rhoades raped her. Idaho Code § 19-2515(g)(5). (2) Michelbacher's murder was by the infliction of numerous gun shot wounds, including the final shot to the middle of her chest, accompanied with the specific intent to cause death. It was murder of the first degree. *Id*. § 19-2521(g)(7). (3) The circumstances of the Michelbacher murder and related crimes

show a propensity to commit murder which will probably constitute a continuing threat to society. *Id.* § 19-2515(g)(8).[2]

With respect to the kidnapping conviction, the court found three aggravating circumstances beyond a reasonable doubt: (1) Rhoades's conduct from 7:30 a.m. on March 19 when he kidnapped Michelbacher until her death later that same day, including subjecting the victim to rape and related sexual abuse, shows the intentional infliction of grievous mental and physical injury. Idaho Code § 18-4505(6)(a). (2) By kidnapping the victim and conducting himself as he did, Rhoades knowingly created a great risk of death which ultimately occurred under tragic circumstances. *Id.* § 18-4505(6)(b). (3) The kidnapping and associated actions could only have terrorized, and caused severe mental anguish and horror to Michelbacher during the last hours of her life. She was not released unharmed. Thus, the kidnapping was especially heinous, atrocious, cruel and manifested exceptional depravity. *Id.* § 18-4505(6)(d). The trial court found each aggravating circumstance, standing alone, would be sufficient to impose the death penalty, i.e., after weighing all the facts and circumstances, the mitigating factors did not outweigh the gravity of any one of them.

In the district court Rhoades submitted a 1000-page factual proffer that contained declarations from Craig Beaver, Ph.D., a neuropsychologist, Pablo Stewart, M.D., a psychiatrist and neurologist, Rhoades's Bingham County attorney, two police officers, various members of his family and several friends; medical records for Rhoades and his family; criminal records for his father and other members of the family; his elementary school transcript; and a family tree depicting drug and alcohol abuse, suicide, intelligence, mental health, and criminal convictions.

---

[2]The court also indicated that the crime exhibits utter disregard for human life, which satisfies factor (g)(6), but made no formal finding to avoid possible overlapping of statutory aggravating factors.

Dr. Beaver's declaration, which synthesized the other declarations as well as the records in Rhoades's proffer, indicates that Rhoades's father was intellectually deficient, physically abused, and suicidal before marrying his mother; there was extensive alcoholism and drug addiction in Rhoades's immediate and extended family; reportedly Rhoades's parents beat up at least some of their children and there was physical and emotional abuse between his father and mother; Rhoades's sister was sexually abused by cousins and an uncle, and there were reports of "unhealthy sexual behaviors" among Rhoades's sisters and extended family; one of Rhoades's sisters told another sister that she had been sexually active with Rhoades for years, and Rhoades entered into a sexual relationship with his aunt after his uncle committed suicide; and his family had an extensive criminal history. Beaver further stated that "[t]he alcoholism and suicides seen in the past generations of [Rhoades's] family very likely play a genetic role in the emotional and mental health of [Rhoades] and his siblings." His report concluded that Rhoades's family context deprived him of normal development; his own medical problems further limited his potential as a human being; it was not surprising that he had chemical dependency issues and knew little about normal sexual and interpersonal relationships; his drug addiction was overdetermined; he was genetically loaded for substance abuse; his chronic use of methamphetamine "may well have damaged his brain in areas critical to impulse control and the ability to think clearly in high pressured situations"; and "further neurophysychological testing has always been necessary to fully and adequately assess Paul Rhoades."

Based on Beaver's declaration and other items in the proffer, Dr. Stewart provided a "working assessment regarding psychiatric findings." He wrote that Rhoades was at significant risk of developing a substance abuse disorder from an early age; Rhoades inherited the diseases of alcoholism and drug abuse; he was born into a family that suffered from major mental illness and neuropsychological impairment; multiple members of Rhoades's family have been institution-

alized, have been determined to have sub-average intelligence, and have committed suicide — which puts Rhoades "at substantial risk of developing his own mental health problems, including mood disorders, cognitive dysfunction, substance abuse, and suicidality"; Rhoades "may have been born with some mental deficiencies"; he was placed in special education classes in school; Rhoades's family is overwhelmingly positive for mental illness, which "places him at severe risk for developing his own mental health conditions"; and Rhoades's history, including polio, is "extremely suggestive of his suffering from post Traumatic Stress Disorder that had a childhood onset" even though the requirements of the DSM-IV are not satisfied in all aspects. Stewart's "working assessment" listed diagnoses of Posttraumatic Stress Disorder, Cognitive Disorder NOS, Substance Induced Mood Disorder, and Substance Induced Psychotic Disorder, without further elaboration.

B

Rhoades contends that his counsel was constitutionally ineffective for having failed to uncover the mitigating evidence exemplified in his proffer. The district court found that Rhoades could not establish deficient performance in light of counsels' concerns about the extent to which their expert would help or hurt and the possibility of developing adverse information that could have been used in Rhoades's pending murder cases. It also concluded that Rhoades could not establish prejudice because the aggravated nature of these crimes was too strong, and new mitigating evidence added too little, to create a reasonable probability of a different outcome.

[1] "To prevail on this claim, [Rhoades] must meet both the deficient performance and prejudice prongs of *Strickland*." *Wong v. Belmontes*, 130 S. Ct. 383, 384 (2009) (per curiam). Accordingly, if Rhoades cannot meet "the highly demanding and heavy burden of establishing actual prejudice," *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005)

(internal quotation marks and brackets omitted), it is unnecessary to determine whether Rhoades's counsel's performance was deficient, *see Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."). This is the course that we follow.

**[2]** To demonstrate actual prejudice under *Strickland*, a " 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (quoting *Strickland*, 466 U.S. at 694). "To assess that probability, we consider the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — and reweigh it against the evidence in aggravation." *Porter v. McCollum*, 130 S. Ct. 447, 453-54 (2009) (per curiam) (internal quotation marks and brackets omitted). Finally, "[i]n evaluating prejudice," Rhoades's "ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Rios v. Rocha*, 299 F.3d 796, 808-09 (9th Cir. 2002) (internal quotation marks omitted).

**[3]** We agree with the district court's analysis. The crimes were especially cruel, as the trial court found and for the reasons it gave. The state court was also aware of mitigating circumstances that were individual to Rhoades. For sure, they were not as detailed or extensive as in the proffer, but the difference between what Rhoades's counsel investigated and presented, and what they could have investigated and presented, is not so pronounced that the new evidence would have outweighed any one of the aggravating circumstances. As the district court noted, even the proffer has no persuasive evidence that Rhoades was himself physically or violently abused as a child, abandoned, placed within the state's custody, or otherwise institutionalized. Further, as the court

found, despite the passage of twenty years, the defense experts do not conclusively fill in the blanks about Rhoades's mental or emotional state. We considered the same proffer and expert submissions in the Baldwin case, and conclude that they have no greater effect here for the same reasons we explained there. *See Rhoades v. Henry* (Baldwin), 596 F.3d 1170, 1191-95 (9th Cir. 2010). Accordingly, Rhoades cannot satisfy the prejudice prong of *Strickland*. Therefore, his claim of ineffective assistance of counsel based on the failure to investigate and present mental state issues fails.

## C

Rhoades's assertion that he was entitled to an evidentiary hearing is unsupported by argument. Not only does this waive the issue, but Rhoades points to no additional evidence that would be presented if one were held. We will not find an abuse of discretion in these circumstances.

## III

**[4]** The trial court imposed the death sentence for the crime of first degree kidnapping in addition to the death sentence imposed for first degree murder. Neither the circumstances found by the sentencing judge, nor any listed in the Idaho statute, requires death.

**[5]** As a result, Rhoades contends his sentence on the kidnapping count is unconstitutional for several related reasons. First, it violates the Eighth Amendment because it is grossly disproportionate to the offense under *Coker v. Georgia*, 433 U.S. 584 (1977) (so holding with respect to rape of an adult woman), and *Enmund v. Florida*, 458 U.S. 782 (1982) (so holding with respect to aiding and abetting a felony that results in death where the defendant did not himself kill, attempt to kill, or intend that killing take place). He points out that death was not an element of the crime, or an aggravating circumstance, and asserts that the trial court did not consider

Michelbacher's death to be an aggravating circumstance in imposing the death sentence. Also, Rhoades complains that the sentencing judge double counted the fact of death, contrary to Idaho law. We considered, and rejected, the same arguments in the Baldwin case, which we follow in this case. *Rhoades* (Baldwin), 596 F.3d at 1195-96. In short, violations of state law are not cognizable on federal habeas review. Death did occur here, unlike *Coker*, *Eberheart v. Georgia*, 433 U.S. 917 (1977), and *Enmund*. The trial court's summation left no doubt that Rhoades intended to take Michelbacher's life and took it in an especially atrocious way. *See Kennedy v. Louisiana*, 128 S. Ct. 2641, 2646 (2009) (holding that the Constitution bars imposition of the death penalty for the rape of a child "where the crime did not result, and was not intended to result, in death of the victim").

**[6]** Further, Rhoades submits that he was unlawfully sentenced to death where the victim was an adult and the aggravating circumstances allow for death to be imposed for as little as a "mental injury" or the mere "risk" of harm. He also contends that the statutory aggravators found by the trial court do not sufficiently narrow the class of individuals eligible for the death penalty because they permit the imposition of death for a crime less than murder. This retreads his basic *Coker* argument, and fails for the reasons set out in *Rhoades* (Baldwin). 596 F.3d at 1196. Beyond this, Rhoades simply understates the statute, which requires "grievous" mental or physical injury, Idaho Code § 18-4505(6)(a), and a knowingly created "great" risk of "death," *id.* § 18-4505(6)(b). In any event, the trial court here did not find an unadorned "mental injury" or just a "risk" of harm, but found that Rhoades's conduct subjected Michelbacher to grievous mental injury and to a great risk of death that in fact ensued. Thus, we have no occasion to be concerned with some other application that might be to a non-grievous mental injury or to a non-great risk of death.

**[7]** Finally, Rhoades maintains that the aggravating circumstances relied on by the sentencing court were unsup-

ported by the evidence. So long as any single aggravator is supported, constitutional infirmities as to remaining ones are harmless. *See Pizzuto v. Arave*, 280 F.3d 949, 970-71 (9th Cir. 2002). Accordingly, we start with factor (a), and determine whether any rational trier of fact could have found that Rhoades subjected Michelbacher to torture or the intentional infliction of grievous mental or physical injury. *See Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (applying the *Jackson v. Virginia*, 443 U.S. 307 (1979) standard to federal habeas review of a state court's finding of statutory aggravating factors).

[8] As Rhoades sees it, there is no evidence that Michelbacher suffered grievous mental injury while she was in the van, nor may the rape or shooting be used to establish the grievous physical injury component of the aggravator because the killing itself would be the basis of a felony-murder charge that, in turn, could be the basis for a death sentence if the defendant had a specific intent to kill. However, in our view, a rational trier of fact could find that Rhoades intentionally inflicted grievous mental or physical harm. Michelbacher was a random kidnapping victim. She had abrasions on her mouth and chin caused by sliding across pavement or something like it. Rhoades raped Michelbacher and then shot at her. The first shot probably went into her left femur, fracturing it. After she was lying down Rhoades shot her eight more times. Rhoades also repeats his argument that Idaho law does not allow double-counting, but we do not reach this question because it is a matter of state law.

[9] After viewing the evidence in the light most favorable to the prosecution, we conclude that any rational fact-finder could have found aggravating factor (a) beyond a reasonable doubt. Given sufficiency of the evidence on this aggravator, we have no need to consider the others.

IV

Section 19-2719(3) of the Idaho Code requires a capital defendant to raise all known legal or factual challenges to his

conviction or sentence in one application for post-conviction relief within forty-two days of sentencing. Rhoades submits that these requirements violate his rights to equal protection and due process. However, we resolved this issue in *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001) (affirming as to all challenges to Idaho Code § 19-2719 except to the extent it applied to ineffective assistance claims when no new counsel had yet been appointed).

V

**[10]** One issue remains that is not certified for appeal.[3] In it, Rhoades claims that victim impact statements of the sort made in this case by Michelbacher's husband — expressing his desire to see justice is done — are unconstitutional under *Booth v. Maryland*, 482 U.S. 496 (1987). Assuming that reasonable jurists would find the point debatable, *see Slack v. McDaniel*, 529 U.S. 473, 484 (2000), and that a COA should issue, we reach the same conclusion on the merits here as in the Baldwin case. *Rhoades* (Baldwin), 596 F.3d at 1197-98. In short, Albert Michelbacher's statement essentially expresses an opinion of the crime, which implicates the prong of *Booth* that survived *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991). However, sentencing in this case was to the court, not to a jury, and we presume that the judge knew and applied the law. As a result, there is no *Booth* error.

DENIAL OF RELIEF AS TO SENTENCE AFFIRMED.

---

[3]An appeal may not be taken unless the district judge or we issue a Certificate of Appealability (COA). 28 U.S.C. § 2253(c)(1). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).